**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Mary Ellen Wilson, | ) | No. CV-04-1373-PHX-NVW |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | (Not for Publication) |
| The John C. Lincoln Health Network Group Disability Income Plan, et al., | ) | |
| Defendant. | ) | |

The court has before it Plaintiff's Motion for Summary Judgment, Doc. # 27; Plaintiff's Statement of Facts, Doc. # 28; Defendants' Response to Plaintiff's Motion and Defendants' Cross-Motion for Summary Judgment, Doc. #29; Defendants' Statement of Facts, Doc. # 30; Plaintiff's Reply, Doc. #31; and Defendants' Reply in support of their Cross-Motion for Summary Judgment, Doc. # 35.

On July 25, 2002, Plaintiff ("Wilson") filed a claim for disability benefits with Liberty Life Assurance Company of Boston ("Liberty"). On October 22, 2002, Liberty denied Wilson's request because the objective medical evidence did not support Wilson's alleged amount of pain. On March 19, 2003, Wilson appealed Liberty's initial denial. After Wilson's appeals were denied, Wilson brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1132(a)(1)(B).

1  **I.     Statement of the Case**

2      Wilson is a fifty-one year old female who worked as a registered nurse until April 26,

3  2002, when she stopped working because of her medical conditions.  Plaintiff Statement of

4  Facts ("PSOF") at ¶ 1.  On July 25, 2002, Wilson filed a claim for long-term disability

5  benefits through John C. Lincoln, her employer, and Liberty.  *Id.*  Wilson stated that her

6  primary impairment was cervical disc disorder, but that she also suffered from lumbar disc

7  disease with radiculopathy, fibromyalgia, depression, migraines, bilateral carpal tunnel

8  syndrome, and osteopenia.  LL-Claim-00044.

9      In her initial claim, Wilson provided evidence and reports from three doctors: Dr. Lisa

10 Sparks, a pain specialist; Dr. Robert Waldrip; and Dr. Joel E. Colley.  Dr. Sparks began

11 treating Wilson for her pain on December 19, 2000, and continued to do so on a monthly

12 basis.  Dr. Sparks's treatment notes demonstrate that she encouraged Wilson to stop working,

13 LL-Claim-00059, and/or file a claim for disability. LL-Claim-00059, LL-Appeal-00200. Dr.

14 Sparks's treatment notes frequently mention Wilson's pain and discomfort.  On January 1,

15 2002, Dr. Waldrip identified a mild disc bulge at the level of C5,6 and C6,7.  LL-Claim-

16 00133.  Dr. Waldrip also mentioned an old compression fracture at D10, but he did not

17 believe that this fracture was causing Wilson pain. LL-Claim-00133. Dr. Waldrip concluded

18 that a pain clinic might be the only place where Wilson could seek treatment.  LL-Claim-

19 00133.  Finally, Dr. Colley administered a series of epidurals to Wilson to alleviate her pain.

20 LL-Claim-00086 to 00122.

21     On October 22, 2002, Liberty denied Wilson's claim for disability benefits.  Liberty

22 determined that "[a]lthough you report subjective complaints of pain, the objective and

23 clinical findings do not establish that your cervical disc disease, lumbar disc disease,

24 Fibromyalgia, depression, migraine, bilateral carpal tunnel syndrome is of a nature and

25 severity which would prevent you from performing the material and substantial duties of

26 your occupation." LL 00149-00151. On March 19, 2003, Wilson informed Liberty of her

27 intention to appeal the October 22, 2002 denial of benefits.  LL-Appeal-00156.

28

On June 30, 2003, Wilson submitted additional objective medical evidence to be considered by Liberty, including a Functional Capacities Evaluation Summary Report from Richard S. Randall, P.T.; two narrative letters from Dr. Sparks (dated February 20, 2003 and June, 19, 2003); a Residual Functional Capacity Form from Dr. Sparks; medical records from Dr. Sparks covering the period from May 30, 2002 through June 5, 2003; a Residual Functional Capacity Form from Joy Schechtman, D.O.; medical records from Dr. Schechtman covering the period from July 1, 2002 through September 30, 2002; a vocational expert's assessment of Wilson's ability to continue working in the nursing profession; and medical records from Dr. Sephen Flitman covering the period from January 15, 2003 through March 14, 2003. LL-Appeal-00190. Dr. Sparks, Dr. Schechtman, and Randall each concluded that Wilson could not physically perform her occupation as a nurse. In her narrative letters, Dr. Sparks addressed Liberty's reason for its initial denial–a lack of objective medical evidence, concluding that the medical evidence established Wilson's disability. Dr. Flitman performed a number of medical tests on Wilson, and concluded that she suffered from: (1) cervical radiculopathy, C6-7 on the left, but no evidence of myelopathy; (2) cervical strain; and (3) migraine, intractable, with aura. LL-Appeal-00223. Dr. Flitman further specified that the MRI of the cervical spine was notable because it revealed a mild to moderate sized broad-based disc bulge and annular tear at C6-7. LL-Appeal-00223. Dr. Flitman also stated that Wilson's cervical spine films, taken on January 1, 2003, demonstrated moderate degenerative disc changes at C6-7 and straightening of the cervical lordosis. LL-Appeal-00223.

Liberty asked Dr. Gale Brown and Dr. Thomas Cuevas to review Wilson's medical records. Dr. Brown concluded that Wilson did have some physical impairments related to her cervical spine condition, but that they did not preclude her from performing her occupation as a nurse. LL-Appeal-00269. Dr. Brown also stated that there was no indication that Wilson's condition worsened at the time she applied to Liberty for disability benefits. LL-Appeal-00269. Similarly, Dr. Cuevas determined that Wilson's impairment was not severe enough to prevent her from performing her previous occupation as a nurse.

1   On July 23, 2003, Liberty upheld its initial decision to deny Wilson's request for

2   disability benefits.  LL-Appeal-00293. Liberty relied on the medical conclusions of Dr.

3   Cuervas and Dr. Brown in reaching its decision.  Liberty cited a lack of medical evidence as

4   its primary reason for denying Wilson's request.  LL-Appeal-00293.  Liberty, however, also

5   noted a lack of evidence demonstrating a change in Wilson's condition on April 27, 2002, the

6   date she alleged she became disabled.  LL-Appeal-00293.

7   Wilson filed a claim with the Social Security Administration, claiming that her back

8   condition and related pain rendered her disabled and unable to perform any occupation.  The

9   Social Security Administration approved Wilson's disability claim.  PSOF at ¶ 1.

10  **II.      Standard of Review**

11  **A.      Standard for Summary Judgment**

12  To defeat a motion for summary judgment, the opposing party must set forth specific

13  facts showing that there is a genuine issue of material fact in dispute.  Fed. R. Civ. P. 56(e);

14  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A dispute about a material fact

15  is genuine "if the evidence is such that a reasonable jury could return a verdict for the

16  nonmoving party."  *Id.* at 248 (1986).  In the absence of such facts, "the moving party is

17  entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

18  (1986) (citations omitted).

19  The party seeking summary judgment bears the initial burden of informing the court

20  of the basis for its motion, and identifying those portions of the pleadings, depositions,

21  answers to interrogatories, and admissions on file, together with the affidavits, if any, which

22  it believes demonstrate the absence of any genuine issue of material fact.  *Id.*  Summary

23  judgment is appropriate against a party who "fails to make a showing sufficient to establish

24  the existence of an element essential to that party's case, and on which that party will bear

25  the burden of proof at trial."  *Id.* at 322.  Although the initial burden is on the movant to show

26  the absence of a genuine issue of material fact, this burden may be discharged by indicating

27  to the court that there is an absence of evidence to support the nonmoving party's claims.  *See*

28  *Singletary v. Pennsylvania Dep't of Corr.*, 266 F.3d 186, 193 n.2 (3d Cir. 2001).  When

- 4 -

1    parties file cross motions for summary judgment, a court must determine whether summary

2    judgment for either party is appropriate.  *Fair Housing Council of Riverside County, Inc. v.*

3    *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

4                **B.    Standard of Review for Denial of Benefits**

5            "A denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a *de*

6    *novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

7    authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*

8    *Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  If the plan provides such

9    discretionary authority to the administrator or fiduciary, the standard of review is abuse of

10   discretion. *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321 (9th Cir. 1994).  However, if

11   an affected beneficiary produces material, probative evidence, beyond the mere fact that an

12   apparent conflict exists, that the plan administrators were breaching their fiduciary duty, and

13   the administrators fail to demonstrate that the conflict of interest did not affect their decision

14   to deny benefits, the standard of review is *de novo*.  *Id.* at 1323.

15   **III.   Analysis**

16           The Liberty Life Insurance Plan provides that it shall have discretion in determining

17   eligibility benefits.  LL-Policy-00029 ("Liberty shall possess the authority, in its sole

18   discretion, to construe the terms of this Policy and to determine benefit eligibility hereunder.

19   Liberty's decision regarding construction of the terms of his Policy and benefit eligibility

20   shall be conclusive and binding.").  The standard of review is therefore abuse of discretion

21   unless Wilson can produce material, probative evidence that the plan administrators breached

22   their fiduciary duties.  The parties also agree that an apparent conflict of interest exists

23   because Liberty both administers the plan and funds the benefit payments under the policy.

24                **A.    Conflict of Interest**

25           The mere fact that an administrator is both the decision-maker and the payor, creating

26   an inherent and apparent conflict of interest, is insufficient to create a conflict of interest that

27   would alter the standard of review.  *Atwood*, 45 F.3d at 1323.  When the plan provides

28   discretion, the court presumes that the decision-maker acted in a neutral, unbiased manner

and applies an abuse of discretion standard.  The plan administrator loses this presumption of neutrality when the insured presents material, probative evidence demonstrating an actual conflict of interest that the administrator fails to rebut.  *Tremain v. Bell Industries Inc.*, 196 F.3d 970, 976 (9th Cir. 1999).  The court then applies de novo review to evaluate the plan administrator's decision.

Under the facts of this case, de novo review would be warranted.  As will be discussed below, Wilson has presented evidence demonstrating that Liberty abused its discretion. Some of this same evidence–in particular, Liberty's failure to provide a full and fair review and Liberty's importing an objective-medical-evidence exclusion into the plan–is relevant to whether Liberty's conflict of interest impaired its ability to act as a neutral decision-maker.[1] In addition, the Court concludes that it erred in its June 13, 2005 order, Doc. # 26, denying Wilson's request for discovery on the relationship between Liberty and Drs. Brown and Cuevas.  That information was within the scope of discovery and was reasonably calculated to lead to admissible evidence which, if it exists, would be additional evidence relevant whether Liberty's inherent conflict of interest did affect its decision to deny benefits to Wilson.

The court, however, does not need to apply this heightened de novo review because it is clear that Liberty abused its discretion.  The Court's disposition based on abuse of discretion and action contrary to the facts makes it unnecessary to decide this case under de novo review.

## B.    Abuse of Discretion

The abuse of discretion standard requires reversal of the findings of a plan administrator if they are found to be arbitrary and capricious.  *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 960 (9th Cir. 2001).  However, "[d]eferential review . . . does not mean no review.  If the administrator's decision is arbitrary, as where the

---

[1]The abuse of discretion section provides a more detailed discussion of such evidence.

administrator arbitrarily refuses to credit a claimant's reliable evidence, the administrator's decision fails the fair review requirement of the statute." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 879 (9th Cir. 2003) (citations and internal quotation marks omitted).

There is not a clear "checklist" of factors for determining whether a plan administrator abused its discretion in denying a disability claim.  Oftentimes, the same factors that demonstrate a conflict of interest also demonstrate an abuse of discretion.  *Compare Jordan*, 370 F.3d at 879 (treating the failure to provide a full and fair review as evidence demonstrating an abuse of discretion) *with Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110-11 (9th Cir. 1999) (treating the failure to provide a full and fair review as evidence demonstrating an actual conflict of interest).  *Also compare Tremain v. Bell Industries Inc.*, 196 F.3d at 977 (9th Cir. 1999) (concluding that the plan administrator's application of an incorrect definition of disability demonstrated an actual conflict of interest) *with Saffle v. Sierra Pacific Power Co.  Bargaining United Long Term Disability Income Plan*, 85 F.3d 455, 459-61 (9th Cir. 1996) (stating that when the plan administrator applied an incorrect definition of disability–writing in a reasonable accommodation requirement–the plan administrator abused its discretion).  The conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion." *Tremain*, 196 F.3d at 976 (citations and internal quotation marks omitted).

Wilson puts forth five arguments for why Liberty abused its discretion when it denied Wilson's disability claim.  Wilson argues (1) that Liberty rewrote its definition of disability by requiring Wilson to submit objective medical evidence that viewed alone would establish that Wilson was disabled; (2) that Liberty failed to provide Wilson with a full and fair review; (3) that Liberty should have physically examined Wilson; (4) that Liberty improperly relied on Wilson to demonstrate a "change in condition" on the date she alleges she was no longer able to work; and (5) that Liberty cursorily disregarded Wilson's medical evidence.  Each of these arguments is addressed in turn.

### 1.      Liberty's Definition of Disability

Plan administrators may not write-in policy exclusions.  *See Canseco v. Southern California Const. Laborers Trust*, 93 F.3d 600, 608 (9th Cir. 1996) (holding that "[plan administrators] may not construe a plan so as to impose an additional requirement for eligibility that clashes with the terms of the plan").  "[I]t is an abuse of discretion for ERISA plan administrators . . . to construe provisions of the plan in a way that conflicts with the plain language of the plan."  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir. 1999).  Wilson argues that Liberty wrote in an exclusion when Liberty relied entirely on a lack of objective medical evidence, and disregarded Wilson's subjective pain allegations, in denying Wilson's disability claim.

The Plan's definition of "disability" and "disabled" does not refer to objective medical evidence:

> (i) If the covered person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and
> (ii) After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

LL-Policy-00006.      However, the section describing long term disability coverage provides that the Plan will pay disability benefits "[w]hen Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician . . . ."  LL-Policy-00015.  Liberty defines "proof" as:

> *[E]vidence in support of a claim for benefits and includes, but is not limited to*: (a) a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits; (b) an Attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's Attending Physician; and (c) *provision by the Attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by Liberty in support of a claim for benefits.*

LL-Policy-00008 (emphasis added).  Pursuant to its proof section, a claimant may submit objective medical evidence.  Liberty's definition of proof, however, does not state that

- 8 -

1  Liberty will evaluate only objective medical evidence when making a disability

2  determination.  Moreover, such an interpretation of "proof" is not logical because the

3  definition explicitly provides that claimants may submit medical evidence that is not

4  considered "objective"–chart notes and treating physician diagnoses.

5      The Plan again refers to objective medical evidence in the section addressing

6  termination of benefits.  Specifically, the Plan provides that Liberty may discontinue

7  disability benefits on "the date the Covered Person or his Physician does not provide Liberty

8  with required medical Proof which supports physical or mental impairment that is

9  demonstrated by clinical and laboratory evidence . . . ."  LL-Policy-00021.  This provision

10  does not state that Liberty will review only objective medical evidence in making a disability

11  determination, referring only to medical proof.  The fact that the section includes "clinical"

12  evidence similarly belies such a conclusion.

13      The Plan provides that Wilson may submit treating physician diagnoses and chart

14  notes as medical evidence demonstrating her disability.  Wilson submitted treating doctors'

15  diagnoses and chart notes, as well as x-rays, MRIs, and other forms of purely objective

16  medical evidence.  Yet Liberty concluded that "while we recognize that Ms. Wilson

17  continues to complain of pain, the totality of medical and vocational documentation reviewed

18  does not substantiate that Ms. Wilson is precluded from performing her own occupation."

19  This statement demonstrates that Liberty did not consider Wilson's pain allegations, doctors'

20  diagnoses, and chart notes; instead, Liberty relied entirely on objective medical evidence to

21  prove Wilson's disability.

22      This is not a case where Wilson did not submit any objective medical evidence–she

23  did.  Liberty decided, however, to evaluate only Wilson's objective medical evidence in

24  making a disability determination.  Liberty's Policy does not provide that an insured filing

25  a disability claim for long-term benefits must conclusively establish with objective medical

26  evidence alone that the insured is disabled.  The Plan explicitly states otherwise by allowing

27  an insured to submit treating doctors' diagnoses, chart notes, and clinical evidence.  The plan

28

1 administrators may not then write in such an exclusion. As *Canseco* holds, writing in an
2 exclusion is an abuse of discretion.

3 **2.      Full and Fair Review**

4 Failure to accord a claimant a full and fair hearing is an abuse of discretion. *See*
5 *Jordan*, 370 F.3d at 879 ("If the administrator's decision is arbitrary, as where the
6 administrator arbitrarily refuses to credit a claimant's reliable evidence, the administrator's
7 decision fails the fair review requirement of the statute." (citations and internal quotation
8 marks omitted)); *see also Yochum v. Barnett Banks Inc.*, 234 F.3d 541, 546-47 (11th Cir.
9 2000) (stating that the plan administrators abused their discretion when they denied
10 Yochum's right to appeal their decision, and that this conduct violated ERISA Section
11 503(2)'s full and fair review requirement). *Cf. also Friedrich*, 181 F.3d at 1110-11 (holding
12 that procedural irregularities and an unfair appeals process demonstrated that the plan
13 administrator acted with a conflict of interest). Here, Wilson points to language in Liberty's
14 denial letter as evidence demonstrating that Liberty failed to provide a full and fair review
15 and thus abused its discretion.

16 The denial letter grounds Liberty's denial in part on Wilson's untimely submission of
17 medical evidence. Liberty stated that,"Our appeal review, however, is prejudiced given that
18 due to the late submission of the appeal documentation, we are unable to conduct any type
19 of medical examination to evaluate the severity of Ms. Wilson's condition at the Date of
20 Disability and the Long Term Disability Benefit Date." LL-Appeal-00288.

21 This was an arbitrary and unfair basis for denying Wilson's claim. The medical
22 evidence submitted by Wilson was not "late"–Liberty granted Wilson an extension to submit
23 evidence by June 30, 2003. Wilson submitted evidence before that date, yet Liberty then
24 penalized Wilson for abiding by the schedule that Liberty itself had earlier authorized.
25 Correspondence between the parties establishes that the only consequence of granting an
26 extension would be to postpone Liberty's disability determination. *See* LL-Appeal-00266
27 (Letter from Liberty to Scott Davis) ( stating, "Ms. Wilson's file has been referred for further
28 medical review and assessment. We regret the delay this will cause in rendering a decision

on Ms. Wilson's claim.  However, this step is necessary in order to provide Ms. Wilson's claim every opportunity for a full and fair review).[2]

Furthermore, through this language Liberty effectively admits that it could not adequately decide whether Wilson was disabled without physically examining her.  Liberty ultimately chose without justification to deny Wilson's claim and disregard Wilson's medical evidence without conducting such an examination, which is not a full and fair review.

### 3.    Liberty's Reliance on the File Review

As discussed above, Liberty declined to exercise its right to have a medical professional physically examine Wilson.  Rather, Liberty relied on non-treating, non-examining doctors to review the records generated by Wilson's treating physicians.  While Liberty was not generally obligated to conduct a physical examination of Wilson, the fact that Liberty declined this option is relevant to whether Liberty abused its discretion.  In prior litigation against Liberty, a court stated:

> [W]e regard Liberty's decision to conduct a file review rather than a physical exam as just one more factor to consider in our overall assessment of whether Liberty acted in an arbitrary and capricious fashion.  Thus, while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination–especially where the right to do so is specifically reserved in the plan–may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  Moreover, the need to physically examine an insured is even more pronounced when that person alleges severe pain which objective medical evidence cannot fully corroborated.  *See, e.g., Heinrich v. Prudential Ins. Co. of Am.*, 2005 U.S. Dist. LEXIS 15566, *26 (N.D. Cal. 2005) (explaining that the failure of the physicians to perform their own examinations of a patient who was complaining of severe pain and fibromylagia entitled their opinion to less weight despite the Supreme Court's decision in *Black & Decker* that the treating-physician rule did not apply in cases brought under ERISA).

---

[2]In addition, Liberty acknowledged that it had additional time, if necessary, to review Wilson's claim.  See Liberty's July 8, 2003 letter to Wilson in which Liberty cited ERISA for the proposition that Liberty could receive an extension.

1      Finally, Dr. Brown discounted Wilson's pain allegations because Dr. Brown asserted

2   that Wilson was "drug seeking."  *See* LL-Appeal-00269 to -00277 (Letter from Dr. Brown)

3   (referring to the fact that Wilson admitted to being treated for alcoholism several times in her

4   report, suggesting that Wilson was "drug-seeking," and concluded that Wilson has a

5   "[c]hronic opoid use/dependency).  This is an inference of drug-seeking from the mere fact

6   Wilson was treated for alcoholism.  That inference is unwarranted and, if permitted, allows

7   reviewing doctors to use alcoholism as a ground to reject an insured's subjective pain

8   complaints.  It further shows that Liberty, in relying on that opinion, abused its discretion.

9                   **4.      "Change in Condition"**

10     Liberty also justified its denial of Wilson's claim on the ground that Wilson failed to

11  demonstrate a change in her condition on the day that she claims she became disabled.  LL-

12  Appeal-00293 ("There is no documentation by Ms. Wilson's attending physicians

13  demonstrating a change in her condition at the date of disability, 4/29/02.").

14     This doubly demonstrates Liberty's arbitrariness.  First, it assumes that one never

15  works while disabled.  This is not true.  *See Perlman v. Swiss Bank Corp. Comprehensive*

16  *Disability Protection Plan*, 195 F.3d 975, 983 (7th Cir. 1999) ("Some disabled people

17  manage to work for months, if not years, only as a result of superhuman effort, which cannot

18  be sustained.  Sometimes work beyond one's limitations is essential to maintain one's

19  standard of living, or is the result of an effort to disguise one's limitations from friends and

20  coworkers.  Reality eventually prevails, however, and limitations that have been present all

21  along overtake even the most determined effort to keep working.").   Second, the medical

22  evidence demonstrates that on several occasions before July 26, 2002–the date on which

23  Wilson filed her disability claim–Dr. Sparks advised Wilson to stop working and file for

24  disability. *See* LL-Claim-00059 (discussed reducing hours with Wilson because of her pain);

25  LL-Claim-00054 (on two separate dates, Dr. Sparks states Wilson should consider disability);

26  LL-Appeal-00198 (narrative letter of Dr. Sparks) (stating: "I advised her as early as April

27  2001 to consider reducing her work hours.  Mrs. Wilson is the type of person that always

28  pushes herself hard and minimizes her own discomfort").  The medical evidence therefore

1   supports the conclusion that Wilson's condition had deteriorated prior to her alleged disability

2   date.  Although no dramatic change occurred on the day in which she alleged she became

3   disabled, Wilson had worked through pain against the recommendation of her treating

4   physician.

**5.      Liberty's Treatment of Wilson's Evidence**

6        Wilson submitted evidence from five medical specialists, each of whom opined that

7   Wilson was unable to perform her job as a nurse.  Liberty hired two non-examining

8   physicians to review Wilson's medical records.  Both physicians concluded that the objective

9   medical evidence did not demonstrate that Wilson was disabled.   One of the reviewing

10  physicians, Dr. Cuevas, reached his decision without reviewing all of the evidence.

11       "While ERISA does not have a treating physician rule, Plan administrators may not

12  arbitrarily refuse to credit a claimant's reliable evidence." *Boardman v. Edwards Ctr., Inc.*,

13  2004 U.S. Dist. LEXIS 9250, *9 (D. Or. 2004) (citing *Black and Decker Disability Plan v.*

14  *Nord.*, 538 U.S. 822, 834 (2003)).  Wilson submitted extensive medical evidence–some

15  subjective and some objective–demonstrating that she was disabled.  Rather than credit

16  Wilson's evidence, Liberty appeared to look for reasons why the evidence was incorrect or

17  unreliable.  Three examples highlight Liberty's cursory disregard of Wilson's reliable medical

18  evidence.

19       First, Liberty rejected both Dr. Sparks's and Dr. Schectman's Residual Functional

20  Capacity Forms stating:

21       On the Residual Functional Capacities Form completed by Dr. Sparks on 2/20/03, and
         by Dr. Schectman on 1/15/03, both physicians indicate Ms. Wilson 'suffers from
22       memory/concentration difficulties due to his/her medical condition.' However, there
         is no objective medical documentation such as neuropsychological test results or other
23       exam findings, to support this opinion. Conversely, in Dr. Sparks' initial assessment
         on 12/19/00, regarding Mental Status Exam, it is noted Ms. Wilson is appropriately
24       dressed and groomed, alert and oriented in all 3 spheres, memory was said to be
         grossly normal, intelligence average, though process and speech was said to be
25       normal, affect full, mood depressed, and insight and judgment were noted as good.
         Changes in mood and affect are noted throughout Dr. Sparks' treatment records,
26       however no other changes in mental status are documented.

27  LL-Appeal-00292.   In other words, Liberty discounted Dr. Sparks's entire Residual

28  Functional Capacities Form in large part because Dr. Sparks, in an initial visit with Wilson,

1   had commented that Wilson appeared alert and well-oriented.  That initial exam occurred

2   before treatment and over three years before Dr. Sparks completed the Form.  This is a

3   frivolous and arbitrary basis for rejecting the treating physician's opinion.

4          Liberty also rejected the Residual Functional Capacity Forms due to a purported lack

5   of medical evidence demonstrating that Wilson had concentration and memory problems.

6   This objection is, again, frivolous and arbitrary.  The purpose of the Forms was to establish

7   that Wilson's medical conditions–primarily back impairment and related pain–precluded her

8   from working.  The fact that she may have suffered cognitive disabilities was peripheral.

9   Furthermore, Dr. Sparks treated Wilson for over three years.  It is reasonable that she

10  comment on Wilson's mental impairments without necessarily relying on objective medical

11  evidence.

12         A second example of Liberty's cursory disregard for Wilson's medical evidence is

13  Liberty's treatment of Randall's Functional Capacities Evaluation.  Randall physically

14  examined Wilson and then concluded that Wilson could not perform her occupation as a

15  nurse.  Liberty, in turn, chose to disregard Randall's opinion, stating only that Randall failed

16  to provide any "formal validity criteria."  This not a well-reasoned explanation for Liberty's

17  decision to reject Randall's conclusion.

18         A third example of Liberty's cursory disregard for Wilson's medical evidence is

19  Liberty's treatment of Wilson's vocational expert, Nancy Bogg.  Bogg reviewed Wilson's

20  medical records and concluded that Wilson was unable to work in the nursing profession.

21  In disregarding Ms. Bogg's opinion, Liberty merely wrote: "Nancy Bogg, MEd, CRC, CDMS,

22  CCM, has based her opinion that Ms. Wilson is unable to perform her own medium physical

23  demand occupation or any occupation on Mr. Randall's 6/3/03 Functional Capacities

24  Evaluation, and on Dr. Sparks' opinion."  LL-Appeal-00292.  Again, this cursory and

25  unreasoned approach falls to the level of arbitrary and capricious.

26  **IV.   Conclusion**

27         Wilson has submitted evidence demonstrating that Liberty abused its discretion when

28  it denied Wilson's disability claim.  First, Liberty attempted to write an exclusion into its

policy by requiring that Wilson establish her disability through objective medical evidence alone. Liberty's plan provides no such exclusion. Second, in its denial letter, Liberty stated that it was "prejudiced" by Wilson's "late" submission of medical evidence, even though the evidence was submitted prior to the agreed-upon deadline. Third, Liberty chose, and for that plainly invalid reason, not to physically examine Wilson even though she was alleging pain to the extent that her objective medical evidence alone might not clearly establish. Fourth, Liberty relied on an unsubstantiated reason–that Wilson had not demonstrated a "change in condition"–at the time she alleged disability. Fifth, a number of Liberty's reasons for not crediting Wilson's medical evidence were arbitrary and unreasoned.

**V.     Award of Benefits**

There are two possible consequences of a plan administrator's abuse of discretion: award benefits or remand to the plan administrator.

"Remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination." *Saffle v. Sierra Pacific Power Co. Bargaining United Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996) (remanding when the administrator required plaintiff to demonstrate that she was disabled "even with reasonable accommodation" even though the plan did not have an accommodation requirement). However, "a plan administrator will not get a second bite at the apple when its first decision was simply contrary to the facts." *Penny Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2000) (awarding a reinstatement of benefits when an insurance company abused its discretion by improperly terminating an insured's benefits).

Some of the circumstances of this case support either disposition. Liberty committed procedural errors–not physically examining Wilson, stating that the "late" submission date had "prejudiced" Liberty's ability to adequately determine whether Wilson was disabled, and writing in an exclusion that the plain language of the Policy did not support. However, other circumstances demonstrate that Liberty's decision "was simply contrary to the facts." Wilson submitted an extensive amount of evidence, both clinical and objective, demonstrating that

1  she was disabled, which Liberty disregarded cursorily and for palpably fallacious or invalid

2  reasons.  Liberty also improperly required Wilson to demonstrate a "change in condition" on

3  the date that she claimed she became disabled, which, as discussed above, does not refute the

4  evidence that she was in fact disabled on and before the day she stopped working.

5        Given all of the evidence demonstrating Wilson's disability and Liberty's recurring

6  arbitrary disregard for Wilson's medical evidence, the circumstances adequately demonstrate

7  that Liberty's denial was simply contrary to the facts.  Wilson is therefore entitled to an

8  award of benefits.  While procedural error and denials of fair procedure also occurred, which

9  would at a minimum entitle Wilson to a fresh determination in the neutral forum of a court,

10 those errors supplement rather than displace Liberty's fundamental and arbitrary disregard

11 of facts.

12       IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment, Doc.

13 # 27, is granted.  Plaintiff is awarded disability benefits.  Plaintiff may submit by April 10,

14 2006, a form of final judgment to implement this ruling.

15       IT IS FURTHER ORDERED that Defendants' Cross-Motion for Summary Judgment,

16 Doc. # 29, is denied.

17       DATED this 28th day of March 2006.

18

19

20  _____

                    Neil V. Wake

21            United States District Judge

22

23

24

25

26

27

28